## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANKLYN CABRERA GARCIA, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CHRYSLER CAPITAL LLC and B&Z AUTO ENTERPRISES, L.L.C., d/b/a EASTCHESTER CHRYSLER JEEP DODGE, <br><br> Defendants. | Civil Action No. 1:15-cv-05949 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.      In addition to housing and food, automobiles are one of the most important purchases that consumers make.  Nearly 90 percent of the United States workforce commutes to work by car, and most car owners depend on auto loans to pay for that car.  This dependence is rife with the potential for engendering a highly exploitative and  dangerous situation for low-income individuals.  The Consumer Financial Protection Bureau states that "[f]or many families, especially those with low incomes, a car is one of the biggest purchases they make and if they are looking to a subprime loan, it's because they are already struggling financially."[1]

2.      Defendant Chrysler Capital LLC ("Chrysler Capital") loans billions of dollars to American consumers, and many of these loans are to consumers with poor credit or no credit

---

[1] CONSUMER FIN. PROT. BUREAU, CFPB PROPOSES NEW FED. OVERSIGHT OF NONBANK AUTO FIN. COS. (2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-proposes-new-federal-oversight-of-nonbank-auto-finance-companies/.

history at all.  Too often, these vulnerable consumers have no practical options aside from accepting a loan with grossly unfair terms.

3.      Chrysler Capital exploits the vulnerability and economic desperation of low-income consumers by financing car loans with abusively high interest rates. Chrysler Capital engages in this scheme with the active assistance of Chrysler-brand dealers like Eastchester Chrysler Jeep Dodge, who originate the auto loans with consumers only after Chrysler Capital effectively dictates the terms on which it will finance those loans.

4.      On March 18, 2014, Plaintiff Franklin Cabrera Garcia purchased a used 2011 Dodge Durango from Eastchester Chrysler Jeep Dodge for approximately $26,000.  To enable this purchase, the dealership originated a loan from Chrysler Capital with a usurious annual interest rate of 23.67%.  At this interest rate, the total cost of Mr. Garcia's vehicle at the end of the 72-month loan term would have totaled $54,636.75.

5.      Chrysler Capital's controlling member—Santander Consumer USA Inc.—securitizes its subprime auto loans for sale to investors, just as many financial institutions have done with mortgages.  And investors are buying.  Last September, Santander Consumer USA sold bonds consisting of auto loans for $1.35 billion, a staggering sum without even considering that Santander Consumer USA could not satiate over $1 billion in investor demand.  Auto loan securitizations have grown 302 percent, to $20.2 billion since 2010.  Subprime securitizations alone have increased 28 percent since 2013.  Investors are betting that consumers—even those in dire financial straits—will go to great lengths to make their car payments.  As put by one

Santander Consumer USA investor, "[y]ou can sleep in your car but you can't drive your house to work."[2]

6.      Chrysler Capital targets vulnerable, low-income consumers like Mr. Garcia who desperately need a car to go to work and take care of their family and who have essentially no bargaining power.  Knowing the fundamental importance of automobiles in these consumers' lives, Chrysler Capital takes advantage of them by imposing interest rates that are unreasonable, unfair, and illegal under New York law.

7.      Usury laws are nearly as old as lending itself.  They protect susceptible borrowers from rapacious creditors and provide macroeconomic benefits by limiting the overall amount of credit in the marketplace, lowering default rates, and protecting the financial well-being of low-income communities.  Chrysler Capital's predatory conduct threatens all of these salutary effects.

8.      Chrysler Capital violates New York's usury statute—which sets the maximum annual interest rate at 16%—by abusing the form of the retail installment contract to conceal transactions that are in substance loans with annual interest rates above 16%.  Chrysler Capital engages in a seeming three-way transaction with dealerships and consumers wherein, pre-sale, the dealership transmits the potential purchaser's credit information to Chrysler Capital, Chrysler Capital dictates the terms upon which it will loan the purchase money to the purchaser, the dealership enters into a "retail installment contract" (a *de facto* loan agreement) with the purchaser on those loan terms, and the dealership immediately "assigns" the "retail installment contract" to Chrysler Capital.  This apparent three-way transaction is an artifice, however,

---

[2] Michael Corkery & Jessica Silver Greenberg, *Investment Riches Built on Subprime Auto Loans to the Poor*, N.Y. TIMES, Jan. 26, 2015, *available at* http://dealbook.nytimes.com/2015/01/26/investment-riches-built-on-auto-loans-to-poor/.

intentionally designed to conceal a two-way loan transaction between Chrysler Capital and the purchaser in which the dealership acts on Chrysler Capital's behalf as a loan originator.

9.      Chrysler Capital's use of dealerships as loan originators to conceal usurious lending practices is its standard way of doing business, and Chrysler Capital is the preferred lender for loans originated by Chrysler-brand dealerships.

10.     Thus, Mr. Garcia brings this action on behalf of himself and all other Chrysler Capital borrowers in the State of New York who purchased vehicles at Chrysler-brand dealerships, whose financing was approved by Chrysler Capital before their respective retail installment contracts were executed, and whose annual interest rate exceeds 16%.  Upon information and belief, Chrysler Capital has intentionally charged illegal interest rates to thousands of New York consumers, directly causing them financial harm.  Accordingly, Chrysler Capital must stand to account before the law.

## PARTIES

11.     Plaintiff Franklyn Cabrera Garcia is a citizen and resident of the Bronx, New York, located in the County of Bronx.  In 2013, Mr. Garcia's gross income was approximately $38,000.  In 2014, it was approximately $34,000.

12.     Defendant Chrysler Capital LLC is a Delaware limited liability company. Chrysler Capital has two members: FCA US LLC (formerly known as Chrysler Group LLC) and Santander Consumer USA Inc.  FCA US LLC is a Delaware limited liability company, and its members are FCA North America Holdings LLC and Fiat Chrysler Automobiles N.V.  In turn, FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V.—an entity formed and with its headquarters outside of the United States.  Santander Consumer USA Inc. is

an Illinois corporation with its headquarters in Dallas, Texas.  Accordingly, Chrysler Capital is a

citizen of Illinois and Texas.

13.     Defendant B&Z Auto Enterprises, LLC, d/b/a Eastchester Chrysler Jeep Dodge

("Eastchester Chrysler" or "Dealership") is a New York limited liability company.  Upon

information and belief, all members of Eastchester Chrysler are New York citizens.  The

Dealership is located at 4007 Boston Road, Bronx, NY 10466.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28

U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum

or value of $5,000,000 and is a class action in which at least one member of the Class (as defined

below) is a citizen of a State different from at least one Defendant, *id.* § 1332(d)(2)(A).

15.     Moreover, under 28 U.S.C. § 1367, this Court may exercise supplemental

jurisdiction over the related state law claims because all of the claims are derived from a

common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them

in one judicial proceeding.

16.     This Court has personal jurisdiction over Chrysler Capital and Eastchester

Chrysler because they conduct substantial business in this District and the actions giving rise to

the claims asserted in this Complaint took place in this District.

17.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because a

substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### The Importance of Automobiles in Everyday Life

18.     Owning a car is not a luxury that merely serves to make life more convenient.  As explained by the Center for Responsible Lending:

> Automobiles are one of the largest purchases American households will make, only behind the purchase of a home.  For most households car ownership is . . . a prerequisite to economic opportunity.  Car ownership affects where people can live and significantly expands Americans' options for jobs.  As a result, both the affordability and sustainability of auto financing are central concerns for most American families.[3]

19.     Indeed, almost 90% of the workforce commutes to work by car.[4]

20.     Accordingly, people with few options to buy a car—because of low incomes, poor credit, no credit history, or other reasons—have essentially no bargaining power and are particularly susceptible to the whim and avarice of those, like Chrysler Capital, who would loan them money.

### Chrysler Capital

21.     Chrysler Capital is a "captive" nonbank—"an auto lender whose primary business is to finance the purchase of a specific manufacturer's automobiles."[5]  As Chrysler Capital's

---

[3] DELVIN DAVIS, CENTER FOR RESPONSIBLE LENDING, THE STATE OF LENDING IN AMERICA & ITS IMPACT ON U.S. HOUSEHOLDS: AUTO LOANS 66 (Dec. 2012).

[4] CONSUMER FIN. PROT. BUREAU, CFPB PROPOSES NEW FED. OVERSIGHT OF NONBANK AUTO FIN. COS. (2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-proposes-new-federal-oversight-of-nonbank-auto-finance-companies/.

[5] CONSUMER FIN. PROT. BUREAU, CFPB BULLETIN 2013-02, INDIRECT AUTO LENDING AND COMPLIANCE WITH THE EQUAL CREDIT OPPORTUNITY ACT, March 21, 2013, *available at* http://files.consumerfinance.gov/f/201303_cfpb_march_-Auto-Finance-Bulletin.pdf.

name implies, its primary consumer business is to finance the purchase of Chrysler-brand automobiles, including Dodge vehicles.

22.     According to its website, "Chrysler Capital is a program of Chrysler Group LLC and Santander Consumer USA[.]"[6]  It describes itself as "the Full-Service finance provider for Chrysler Group LLC and its dealers."[7]

23.     Chrysler Capital was formed in February 2013 through a "private-label agreement with Santander Consumer USA Inc."[8]  It is a business unit of Santander Consumer USA, and it launched on May 1, 2013.  Upon information and belief, Santander Consumer USA is the controlling member of Chrysler Capital.

24.     Upon information and belief, Chrysler Capital is the dominant lender for Chrysler-brand dealerships.

25.     As of December 31, 2014, Chrysler Capital's portfolio was $3.68 billion, up from $2.32 billion one year earlier.

**The Nature of Chrysler Capital's Indirect Lending to Finance Automobile Purchases**

26.     Chrysler Capital does not give money directly to auto purchasers.  Instead, it gives the purchase money directly to a dealership.  The purchaser subsequently makes periodic payments (monthly, typically) to Chrysler Capital until the principal and interest are paid in full.

---

[6] https://chryslercapital.com/about (last visited Jun. 10, 2015).

[7] *Id.*

[8] Press Release, Fiat Chrysler Automobiles, Chrysler Capital to Provide Broad Spectrum of Financial Services to Chrysler Group Customers and Dealers (Feb. 6, 2013), *available at* http://media.chrysler.com/newsrelease.do;jsessionid=B114F9DF95FE59990F9ECDFCF8B49FE 7?&id=13824&mid=2 (last viewed Jun. 10, 2015).

As part of the sale and loan transaction, Chrysler Capital obtains a security interest in the automobile.

27.     Loan transactions with Chrysler Capital typically begin in one of two ways. Either the customer obtains pre-approval from Chrysler Capital, often through its website, or obtains approval at the dealership before the sale is consummated.  Either way, the loan-worthiness decision is made by Chrysler Capital and the dealer acts as a loan "originator." Before the deal is finalized, the dealer and Chrysler Capital know that Chrysler Capital will bear all risk of nonpayment.  The dealer acts as a pass-through.  It stands in Chrysler Capital's stead for purposes of the loan paperwork, but it never has any real financial interest in the loan itself. And the dealer bears no risk of the loan.

28.     When a Chrysler Capital loan transaction begins at a dealership, the dealer collects basic information about the applicant and uses an automated system to forward that information to Chrysler Capital.  Chrysler analyzes the applicant's loan-worthiness and responds with a "buy rate"—the lowest interest rate at which it will purchase the RISC (i.e., loan the purchase proceeds to the applicant).  New York law allows for dealers to mark up the rate,[9] in which case Chrysler Capital pays the dealers a "reserve" or "participation" based on the difference in interest revenues between the buy rate and the actual note rate.  This dealer-lender communication and deal making occur *before* terms are even offered to a prospective auto purchaser.  This means that dealerships search for the best deal for themselves—the highest "reserve"—rather than searching for the best deal for the auto purchaser.  It also means that

---

[9] *See* N.Y. PERS. PROP. LAW § 302(10).

dealerships know before finalizing a deal what they will earn and when they will be paid and thus that they incur no risk of non-payment by the borrower.

29.     The vehicle sale and loan transaction is effectuated with a retail installment sales contract ("RISC").  The RISC includes the purchase terms (make and model of vehicle, purchase price, taxes, etc.) and the payment terms (number of payments, amount of payments, interest rate, etc.).

30.     On its face, the RISC is entered into by the purchaser and the dealership, but, in reality, the RISC is a *de facto* loan agreement between Chrysler Capital and the purchaser— particularly evident when Chrysler Capital's role as the assignee of the RISC is stated on the RISC itself, as was the case with the RISC documenting Mr. Garcia's purchase.

31.     Chrysler Capital uses the form of the RISC as an artifice to disguise its usurious intent. Mr. Garcia's experience is typical in this regard. Before the RISC was executed, Chrysler Capital had already analyzed Mr. Garcia's loan-worthiness to determine the usurious rate of interest it would charge.  The Dealership then acted on Chrysler Capital's behalf to originate the loan on Chrysler Capital's specified terms.  The Dealership knew that it would be paid by Chrysler Capital up front, rather than being paid by Mr. Garcia over the course of the loan term, and, upon information and belief, the Dealership was paid within days—if not the same day— that the RISC was executed.  As shown by Mr. Garcia's credit report, Chrysler Capital opened Mr. Garcia's account on the day of the sale transaction.  Put simply, Mr. Garcia borrowed money from Chrysler Capital, Chrysler Capital gave the money to the Dealership, and Mr. Garcia left the Dealership with his 2011 Dodge Durango.  Subsequently, Mr. Garcia owed the principal and interest to Chrysler Capital.

32.     If Mr. Garcia had gone to a state-chartered bank or credit union, the practical result would have been the same.  The bank would have assessed his loan-worthiness (as Chrysler Capital did); if he qualified for a loan, the bank would have given him money (most likely in the form of a cashier's check payable to the Dealership); Mr. Garcia would have given the check to the Dealership; and Mr. Garcia would have left the Dealership with his 2011 Dodge Durango.  Subsequently, he would have owed the principal and interest to the bank.  The highest rate the bank could have charged Mr. Garcia, under New York law, is 16%.  And just as New York's usury statute would apply to this direct loan, it applies to the indirect loan masquerading as an installment sale that Mr. Garcia obtained from Chrysler Capital.

33.     The pre-sale loan approval process is routinized and standard practice for Chrysler Capital.  Chrysler Capital's website states that "[m]ost approvals are received within 30 minutes or less," and that funding typically occurs within "24–48 hours after a deal is purchased."[10]

34.     The fiction that Chrysler Capital is merely an assignee of installment contracts entered into by others, and not a lender in its own right, is belied by Chrysler Capital's own inability to avoid referring to its products as "loans."

35.     The language used on Chrysler Capital's website reveals the true nature of its auto financing transactions as loans.  The FAQ page on that website states that to log in to their accounts customers need the Social Security Number "of either borrower or co-borrower."[11]  If

---

[10] https://chryslercapital.com/dealers/faqs (last visited Jun. 10, 2015).

[11] https://myaccount.chryslercapital.com/support/faq/(last visited Apr. 22, 2015).

there were no loan of money, there would be no "borrower."  Aside from money, there is nothing else that the customer could have borrowed from Chrysler Capital.

36.     On October 2, 2014, Chrysler Capital lowered the maximum dealer participation from 2.00 points to 1.75 points.  This means that dealerships can now add a maximum of 1.75 points to the buy rate provided by Chrysler Capital for any particular loan; when Mr. Garcia obtained his loan the maximum was 2.00 points.  In two internal notices sent by Chrysler Capital to Chrysler dealerships concerning this change in the dealer participation rate, the following language appeared: "Chrysler Capital watches current market conditions very carefully and we feel this change puts us in line with many other *lenders* who have chosen to limit dealer participation below two points[.]"[12]  The term "other lenders" makes sense only if Chrysler Capital views itself as a lender—an entity that makes loans.

## The Auto Finance Industry Views Indirect Auto Financing as Lending

37.     The website of Chrysler Capital's controlling member, Santander Consumer USA, states that Santander Consumer USA provides "New Car Loans" and "Used Car Loans." Santander Consumer USA "offer[s] financing across the credit spectrum through nearly 14,000 dealers nationwide, or online through our RoadLoans . . . program."[13]

38.     Upon information and belief, Santander Consumer USA financing obtained at dealerships is indirect and effectuated through the use of a RISC—just as with Santander Consumer USA's business unit, Chrysler Capital.   Yet Santander Consumer USA expressly admits that these transactions are *loans*.  And, although some of Santander Consumer USA's

---

[12] *Id.* (emphasis added).

[13] https://www.santanderconsumerusa.com/products/new-car-loans.

loans are direct to consumer, it nonetheless describes all of its vehicle finance products as *loans*.

Likewise, the RoadLoans online platform provides direct and indirect funding, to consumers and

dealerships, respectively, but Santander Consumer USA Refers to all RoadLoans products as

*loans*.  Santander Consumer USA even included the word "*loans*" in the RoadLoans name.

### Plaintiff Franklyn Cabrera Garcia's Experience

39.    On February 12, 2014, Mr. Garcia went to the Dealership with the intent of

finding a car to purchase.  He met with a salesman named Randy who spoke Spanish.  Their

entire dealing was in Spanish.  Mr. Garcia found a black Dodge Durango that he liked and paid

$100 as a down payment.  They did not discuss any financing terms.  Nonetheless, the

Dealership requested permission from Mr. Garcia to perform a credit check, which he granted.

Upon information and belief, the Dealership performed a credit check at that time.  Mr. Garcia's

credit score was approximately 514 at that time.  Mr. Garcia intended to consummate the sale

within several weeks.

40.    On February 19, 2014, Mr. Garcia returned to the Dealership to complete the

purchase of the black Durango.  Randy told him that the vehicle had been sold, but that Mr.

Garcia could apply the $100 down payment toward a different vehicle.  Mr. Garcia found a used

Mercedes that he liked and paid down an additional $2,000 in cash.  As before, they did not

discuss financing terms and Mr. Garcia intended to consummate the sale within a month.

41.    On March 18, 2014, Mr. Garcia again returned to the Dealership.  True to form,

the Dealership told him that the used Mercedes had been sold.  At this point the Dealership had

$2,100 of Mr. Garcia's money.  Randy drove Mr. Garcia around the lot and Mr. Garcia found a

white 2011 Dodge Durango that he liked.  Mr. Garcia asked for price information, and Randy

said the purchase price was a bit more than $28,000 and that the monthly payments would be

around $415 per month.  Mr. Garcia agreed to these terms.  Randy told him the monthly

payments would be lower if he provided more as a down payment.  Mr. Garcia then gave an

additional $5,900 in cash, for a total down payment of $7,500.  This entire conversation was in

Spanish.

42. Mr. Garcia was taken to the finance office without Randy.  The lone employee in

the finance office spoke only English.  Mr. Garcia was not given the opportunity to speak with

anyone in the finance department who spoke Spanish, nor anyone else who spoke Spanish to

explain the terms of his purchase.  The finance employee presented Mr. Garcia with a completed

document titled "Retail Installment Contract, Simple Finance Charge" ("Contract" or "Mr.

Garcia's RISC")  in English.  Mr. Garcia was not given the opportunity to view the Contract in

Spanish.  He reasonably believed the written terms reflected his verbal agreement with Randy

that the monthly payments would be just over $400.  In fact, as set forth above, the monthly

payments are more than 50% higher, $628.49.  In addition, the Contract includes a "Service

Contract" for $3,000 that Mr. Garcia never agreed to and did not understand was included

because of the language barrier.

43. The Dealership is located in a part of New York City with a significant Spanish-

speaking population.  According to data from the 2010 U.S. Census, 22.9% of the population of

the zip code in which the Dealership is located is "Hispanic or Latino (of any race)," 17.6%

speak Spanish or Spanish Creole, and 7.7% speaks English less than "very well."  For Bronx

County overall, 53.5% of the population is "Hispanic or Latino (of any race)," 46.5% speak

Spanish or Spanish Creole, and 25.6% speak English less than "very well."  Undoubtedly, the

Dealership expects to do business with Spanish-speaking customers and understands that many

of them have limited capabilities with English.  On its website, the Dealership provides driving directions to its lot in English and Spanish.[14]

44.     Mr. Garcia would not have executed the Contract if he had understood that the monthly payments were higher than promised ($415) or that he was being charged for a "Service Contract."

45.     After Mr. Garcia executed the Contract, Randy entered the finance office and told Mr. Garcia that the monthly payments were over $600.  Mr. Garcia asked why, and Randy told him that his credit score was too low for the promised $415 payments.  However, because the Dealership (Randy, in particular) had performed a credit check one month earlier, the Dealership knew Mr. Garcia's credit status before promising the $415 payments.  This was a classic bait-and-switch whereby one price is promised and another is surreptitiously put in writing.  Worse yet, the writing is in a language that the Dealership knew Mr. Garcia had great difficulty understanding.  Mr. Garcia's entire dealing with the Dealership was in Spanish, except for, notably, his interaction with the finance employee and the Contract itself.

46.     Mr. Garcia purchased the 2011 Dodge Durango for personal, family, or household use.

47.     On the Contract, Mr. Garcia is named as the "Buyer" and "B&Z Auto dba Eastchester CJD" is named as the "Creditor – Seller."

48.     The Contract includes the following items in the table for "Itemization of Amount Financed":

        a.      Cash Price (including $2,578.74 as sales tax):    $28,635.00

---

[14] http://www.eastchesterchryslerjeepdodgeram.com/dealership/directions.htm (last visited Jun. 12, 2015).

|   |   |   |
|---|---|---|
| b. | Total Downpayment: | $7,500.00 |
| c. | Unpaid Balance of Cash Price: | $21,135.00 |
| d. | Registration, Inspection: | $290.00 |
| e. | Fidelity GO Service Contract: | $3,000.00 |
| f. | Dealer Documentation Fee | $75.00 |
| g. | Amount Financed: | $24,500.00 |

The "Cash Price" is erroneous because the Dealership incorrectly calculated the sales tax, leading to errors in the Amount Financed, Finance Charge, Total of Payments, Payment Schedule, and Total Sale Price. The consequences of this error are discussed in greater detail below.

49.     The "Federal Truth in Lending Disclosures" section of the Contract includes the following items:

|   |   |   |
|---|---|---|
| a. | Annual Percentage Rate: | 23.67% |
| b. | Finance Charge: | $22,636.75 |
| c. | Amount Financed: | $24,500 |
| d. | Total of Payments: | $47,136.75 |
| e. | Total Sale Price (including down payment): | $54,636.75 |

50.     The "Payment Schedule" calls for 75 monthly payments of $628.49 to begin on April 17, 2014.

51.     Using 16.0% as the annual percentage rate, the monthly payments would be $518.78, a savings of approximately $110 per month and $8,230 over the 75-month life of the loan.

52.     Sales tax is charged on the "Cash Price," not on the "Total Sale Price," demonstrating that the Total Sale Price was not a genuine credit price reflecting a time-price differential but instead a combination of the cash price and interest on a loan.

53.     The vehicle's mileage is not listed on the Contract.  The CARFAX report for the vehicle states that the mileage was 41,749 as of March 18, 2014, the date of the sale.

54.     Nothing on the Contract indicates that the financial disclosures are estimates or that any information necessary for an accurate disclosure was unknown to the Dealership or to Chrysler Capital.

55.     At the bottom of the first page, there is a section purportedly assigning, without recourse, the Contract to Chrysler Capital, executed by a representative of the Dealership.

56.     The Contract also operates to give the Dealership a security interest in the vehicle, although Chrysler Capital was and is the real holder of that security interest.

57.     Mr. Garcia made payments of $628.49 on April 12, May 16, June 20, and August 1, 2014.  Because the monthly payment based on the legal maximum annual interest rate of 16.0% is $518.78, each of Mr. Garcia's payments included an illegal interest overpayment of $109.71.  In total, he overpaid $438.84 in usurious interest.

58.     On September 5, 2014, Mr. Garcia was driving the Dodge Durango when he noticed smoke coming from the glove compartment and A/C ducts.  He quickly stopped the vehicle on the side of the road.  The doors automatically locked, for a short time, and he was momentarily trapped.  Smoke filled the passenger compartment and flames began to rise from under the floor on the passenger side.  Shortly thereafter, the entire vehicle was engulfed in flames.  The vehicle was destroyed beyond repair and was deemed a total loss. Mr. Garcia suffered burns on his right arm.  Mr. Garcia is currently a lead plaintiff in a class action lawsuit

against Chrysler Group LLC in this Court for the alleged product defect that caused the vehicle fire.[15]

59.     After the fire, Mr. Garcia needed to obtain another vehicle.  He could not afford to pay for two vehicles at once, and he regretfully stopped making the loan payments on his destroyed 2011 Durango.

60.     As of June 26, 2014, according to Chrysler Capital, the payoff amount on Mr. Garcia's loan was $26,702.60.

## CLASS ALLEGATIONS

61.     Plaintiff brings this lawsuit, on behalf of himself and all others similarly situated, as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3) and, in the alternative, under Rule 23(b)(2) and/or 23(c)(4).  This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3).

62.     The class that Plaintiff seeks to represent (the "Class") is defined as follows:

> All residents of the State of New York who purchased a vehicle from a Chrysler-brand dealership, financed that purchase through Chrysler Capital, whose financing was approved by Chrysler Capital before the retail installment contract was executed, and whose rate of interest is greater than 16% per annum.

63.     Excluded from the Class are (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities.

---

[15] *Franklyn Cabrera Garcia et al. v. Chrysler Group LLC*, No. 1:14-cv-08926-KBF.

64.     Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or otherwise modified.

**Numerosity and Ascertainability**

65.     While the exact number of Class members is unknown to Plaintiff at this time and can be determined only by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Chrysler Capital.  At this time, Plaintiff is informed and believes that the Class includes thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all Class members in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will benefit the parties and the Court.

66.     Names and addresses of Class members are available from Chrysler Capital's records.  Notice can be provided to the Class members through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under state law and federal law.

**Commonality and Predominance**

67.     Common questions of law and fact exist as to the Class members, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual Class members within the meaning of Federal Rule of Civil Procedure 23(b)(3).

68.     The common questions of fact and law include, but are not limited to, the following:

(a)     Whether Chrysler Capital violated New York's usury statute by charging interest rates above 16% per annum;

(b)     Whether Plaintiff and Class members are entitled to restitution, declaratory relief, injunctive relief, and reasonable attorney's fees and costs for Chrysler Capital's violation of the New York usury statute;

(c)     Whether Chrysler Capital engaged in deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349;

(d)     Whether Plaintiff and Class members are entitled to damages, injunctive relief, and reasonable attorneys' fees and costs under N.Y. GEN. BUS. LAW § 349; and

(e)     Whether Chrysler Capital was unjustly enriched by its usurious and deceptive practices.

## Typicality

69.    Plaintiff's usury claim is typical of the claims of the other Class members who he seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each Class member have been subjected to the same violations of New York usury law and have been damaged in the same manner thereby.

## Adequacy of Representation

70.    Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiff is an adequate representative of the Class because he has no interests which are adverse to the interests of the Class members.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

## Superiority

71.    A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3)

because the expense and burden of individual litigation makes it economically infeasible for

Class members to seek to redress their claims other than through the procedure of a class action,

and in turn the lack of any other viable method for seeking redress would immunize Chrysler

Capital's illegal and deceptive conduct.

72.     In the alternative, this action is certifiable under Federal Rule of Civil Procedure

23(b)(2) because:

> (a)     The prosecution of separate actions by individual Class members would
> create a risk of inconsistent or varying adjudications with respect to
> individual Class members which would establish incompatible standards
> of conduct for Chrysler Capital;

> (b)     The prosecution of separate actions by individual Class members would
> create a risk of adjudications as to them which would, as a practical
> matter, be dispositive of the interests of the other Class members not
> parties to the adjudications, or substantially impair or impede their ability
> to protect their interests; and

> (c)     Chrysler Capital has acted or refused to act on grounds generally
> applicable to the Class, thereby making appropriate final injunctive relief
> or corresponding declaratory relief with respect to the Class as a whole
> and necessitating that any such relief be extended to Class members on a
> mandatory, class-wide basis.

73.     In the alternative, an issue class under Federal Rule of Civil Procedure 23(c)(4) is

certifiable for the sole issue of whether Chrysler Capital's conduct, as set forth above, constitutes

a violation of New York's usury statute.

74.     Plaintiff is not aware of any difficulty which will be encountered in the

management of this litigation which should preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### CLAIM I: USURY
**(N.Y. GEN. OBLIG. LAW § 5-501)**
**(against Chrysler Capital)**

75.     Mr. Garcia realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

76.     Mr. Garcia brings this Claim on behalf of himself and the Class.

77.     Chrysler Capital is not a retail seller of motor vehicles.

78.     Under New York's usury statute, "[t]he rate of interest . . . upon the loan or forbearance of any money, goods, or things in action . . . shall be [16%] per annum."  N.Y. GEN. OBLIG. LAW § 5-501(1); N.Y. BANKING LAW § 14-a(1).

79.     Loans above the maximum rate of 16% per annum are prohibited: "[n]o person or corporation shall, directly or indirectly, charge, take or receive any money, goods or things in action as interest on the loan or forbearance of any money, goods or things in action at a rate exceeding [16% per annum]."  N.Y. GEN. OBLIG. LAW § 5-501(2).

80.     The statute voids usurious contracts:

> [a]ll . . . notes . . . [and] other contracts . . . whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forbearance of any money, goods or other things in action, than is prescribed in section 5-501 [interest of 16% per annum], shall be void . . .

> whenever it shall satisfactorily appear by the admission of the defendant, or by proof, that any . . . note . . . or any evidence of debt, has been taken or received in violation of the foregoing provisions [interest of 16% per annum], the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled.

*Id.* § 5-511(1), (2).

81.     Moreover, upon a finding of usury, any security interests created in the loan contract are void.  The lender must return all interest already obtained above the legal rate, and the lender cannot recover the unpaid principal balance.

82.     The usury statute defines "interest" broadly: "[t]he amount charged, taken or received as interest shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for account of the lender in consideration for making the loan or forbearance[.]" N.Y. GEN. OBLIG. LAW § 5-501(2).

83.     The usury statute does not define the terms "loan" or "forbearance."  The Second Circuit Bankruptcy Appellate Panel has defined a "loan" as "in substance . . . a transfer of funds from the lender to the borrower which the borrower has agreed to repay."  *Cazenovia Coll. v. Renshaw (In re Renshaw)*, 229 B.R. 552, 556 (B.A.P. 2d Cir. 1999) (citing *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914)).  Loans can be direct or indirect; the lender need not actually give the funds to the borrower for the transaction to constitute a loan.

84.     A leading legal dictionary aptly explains forbearance for purposes of usury law:

> "The terms 'loan' and 'forbearance' are correlative. Permitting one to retain a loan of money after it has become due and payable is forbearing it. That is, forbearance, within the meaning of usury laws, is the giving of further time for the return of payment of money after the date upon which it became due."

BLACK'S LAW DICTIONARY (10th ed. 2014) (quoting JAMES AVERY WEBB, A TREATISE ON THE LAW OF USURY 18 (1899)).

85.     Usury is a question of fact.  To determine whether a transaction is a loan or forbearance and therefore subject to the usury statute, the law looks to the substance of a transaction rather than its form.

86.     The relationship between Chrysler Capital and the Dealership is a sham intended to circumvent the usury laws of New York.

87.     As set forth above, the transaction on March 18, 2014 by which Mr. Garcia obtained a vehicle and thereafter owed the purchase money and interest thereon to Chrysler Capital, in accord with the terms of the RISC, is in substance a loan.  The loan violates the usury statute because the interest rate is 23.67% per annum, as stated on the face of the Contract, well above the legal limit of 16% per annum.

88.     Alternatively, this transaction constitutes a forbearance because Mr. Garcia was obligated to pay $24,500 on the date of the sale.  In substance, Chrysler Capital gave him 75 months of further time to pay this amount.  In exchange for this extension of time, Chrysler Capital charged interest of 23.67% per annum, well above the legal limit of 16% per annum.

89.     Mr. Garcia and the Class members are entitled to

>   (1)     a declaration that their RISCs are void;

>   (2)     a declaration that the security interests obtained by Chrysler Capital in their vehicles by operation of their respective RISCs are void;

>   (3)     a declaration that they are released from all obligations to pay any unpaid principal or accrued interest; and

>   (4)     restitution of all interest already paid above the legal limit of 16% per annum.

90.     In addition, Mr. Garcia and the Class demand an injunction ordering Chrysler Capital to:

>   (1)     cease all collection efforts for unpaid principal and accrued interest on class members' Chrysler Capital accounts;

>   (2)     close all class members' Chrysler Capital accounts with a zero balance;

>   (3)     report to the three major credit reporting agencies (Experian, Equifax, and TransUnion) that they have no outstanding balances in relation to their Chrysler Capital accounts;

(4)     correct their credit reports by reporting to the three major credit reporting agencies (named above) that any notifications that Chrysler Capital made to those agencies of late, or otherwise insufficient, payments in relation to their Chrysler Capital loans were erroneous, if those payments were insufficient because of usurious interest above the 16% per annum legal limit;

(5)     permanently cease all repossession activity in relation to the cars in which Chrysler Capital previously had a security interest arising from a RISC in which the interest rate was above 16% per annum.

91.     In addition, Mr. Garcia and the Class seek reasonable attorney's fees, costs, and any other just and proper relief available at law or in equity.

### CLAIM II: DECEPTIVE ACTS OR PRACTICES
### (N.Y. GEN. BUS. LAW § 349)
### (against Chrysler Capital)

92.     Mr. Garcia realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

93.     Mr. Garcia brings this Claim on behalf of himself and the Class.

94.     Chrysler Capital is liable as the real party in interest to the Contract or, in the alternative, as an assignee of the Contract.

95.     Mr. Garcia and the Class members are "persons" within the meaning of New York General Business Law ("New York GBL") § 349(h).

96.     Chrysler Capital qualifies as a "person," "firm," "corporation," and "association" within the meaning of New York GBL § 349.

97.     "Deceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.  N.Y. GEN. BUS. LAW § 349.  Deceptive acts or practices are those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Id.*

98.     As set forth herein, Chrysler Capital actively and willfully engaged in deceptive acts or practices in violation of the New York GBL § 349 by (1) concealing its true identity as a lender by using a sham transaction in which it labels itself as a RISC "assignee"; and (2) disguising its money lending as installment sales.

99.     Chrysler Capital's deceptive conduct is likely to mislead a reasonable consumer acting reasonably under the circumstances into believing that the dealership is the original creditor, that the sale is an installment sale, and that laws applicable to lending, such as usury, are not applicable.  Therefore, Mr. Garcia and the Class members were unable to properly evaluate the fairness and legality of their loan terms, and Chrysler Capital was able to make illegal profits without the knowledge of Mr. Garcia and the Class members.

100.    Mr. Garcia and the Class members were injured as a direct and proximate result of Chrysler Capital's deceptive conduct because they agreed to and have paid an illegal usurious interest rate without recognizing that the usury laws applied to their loan transactions.

101.    Mr. Garcia and the Class Members are entitled to actual damages (or fifty dollars per violation, whichever is greater), treble damages for Chrysler's willful and/or knowing violations of this statute, and reasonable attorney's fees and costs, under New York GBL § 349(h).

102.    In addition, because Mr. Garcia and the Class members have been injured by Chrysler Capital's deceptive conduct, they are entitled to an order enjoining Chrysler Capital from engaging in the deceptive conduct described above, under New York GBL § 349(h).

### CLAIM III: UNJUST ENRICHMENT
### (against Chrysler Capital)

103.    Mr. Garcia realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

104.    Mr. Garcia brings this Claim on behalf of himself and the Class.

105.    Chrysler Capital was enriched at the expense of Mr. Garcia and the Class Members by its practice of charging usurious interest rates and deceiving Mr. Garcia and the Class members to believe that their loans were installment sales.

106.    As set forth above, it would be against equity and good conscience to permit Chrysler Capital to retain any interest paid by Mr. Garcia and the Class Members above the legal limit of 16% per annum.

107.    Accordingly, Mr. Garcia and the Class Members are entitled to restitution of all interest paid above the legal limit of 16% per annum.

### CLAIM IV: DECEPTIVE ACTS OR PRACTICES
### (N.Y. GEN. BUS. LAW § 349)
### (against Chrysler Capital and the Dealership)

108.    Mr. Garcia realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

109.    Mr. Garcia brings this claim on behalf of himself.

110.    Chrysler Capital is liable as the real party in interest to the Contract or, in the alternative, as an assignee of the Contract.

111.    The Dealership qualifies as a "person," "firm," "corporation," and "association" within the meaning of New York GBL § 349.

112.    As set forth herein, Defendants actively and willfully engaged in deceptive acts or practices in violation of the New York GBL § 349 by (1) overcharging sales tax; (2) secretly including a $3,000 "Service Contract" in the Contract; and (3) engaging in bait-and-switch tactics to substitute $629 monthly payments in lieu of the $415 payments that Mr. Garcia was

promised, thereby charging interest at the exorbitant and usurious rate of 23.67%—in an English language contract that Mr. Garcia did not understand.

113.    Defendants' conduct was likely to mislead a reasonable consumer acting reasonably under the circumstances.

114.    Mr. Garcia was injured as a direct and proximate result of Defendants' deceptive conduct because he overpaid the sales tax, paid $3,000 for an unwanted "Service Contract," and made payments that were more than 50% higher than what he was promised.  Adding insult to injury, these costs were included in the loan principal.  Therefore, the exorbitant 23.67% interest rate applies to these amounts, and, under the terms of the Contract, their cost is doubled over the life of the loan.

115.    Mr. Garcia is entitled to actual damages (or fifty dollars per violation, whichever is greater), treble damages for Chrysler's willful and/or knowing violations of this statute, and reasonable attorney's fees and costs, under New York GBL § 349(h).

116.    In addition, because Mr. Garcia has been injured by Chrysler Capital's deceptive conduct, he is entitled to an order enjoining Chrysler Capital from engaging in the deceptive conduct described above, under New York GBL § 349(h).

### CLAIM V: UNCONSCIONABILITY
### (against Chrysler Capital and the Dealership)

117.    Mr. Garcia realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

118.    Chrysler Capital is liable as the real party in interest to the Contract or, in the alternative, as an assignee of the Contract.

119.    The Contract is procedurally unconscionable.  Mr. Garcia had no meaningful choice as to the financing terms, including the interest rate, imposed upon him.  He suffered from

a significant disparity in bargaining power, and the Dealership had vastly superior knowledge of the auto buying and auto financing process.  Moreover, Mr. Garcia's first language is Spanish; his English is very limited; and the Contract is entirely in English.  Further, the Contract is of adhesion, on pre-printed forms completed by the Dealership, and replete with complex terms and fine print.  Mr. Garcia agreed to borrow money to close the deal, but the payments he was expecting to make, approximately $415 per month, correspond to an interest rate of approximately 7.5%.  He never agreed to the exorbitant rate of 23.67%.

120.    The interest rate in the Contract is substantively unconscionable.  The 23.67% rate imposed on Mr. Garcia is far outside the scope of reasonableness and shocks the conscience, particularly in light of the historically low interest rates that are presently in effect.  Consumer savings accounts are typically paying between 0.5% and 1.0%, and home mortgage loan rates are between 4% and 6%.  The current federal discount rate—the rate at which eligible financial institutions borrow directly from a Federal Reserve bank—is only 0.75%.  And the current federal funds rate—the rate at which banks borrow from each other—is only 0.25%.

121.    Mr. Garcia has been economically harmed by this unconscionable term in the form of excessive interest payments.

122.    Mr. Garcia is entitled to (1) a declaration that the interest rate term in the Contract is void and unenforceable; (2) a declaration that he is liable to Chrysler Capital for only the principal amount of his loan; and (3) restitution of all interest that he has already paid.

123.    In addition, Mr. Garcia seeks reasonable attorney's fees, costs, and any other just and proper relief available at law or in equity.

### CLAIM VI: VIOLATION OF THE MOTOR VEHICLE RETAIL INSTALMENT ACT
### (N.Y. PERS. PROP. LAW §§ 301–316 )
### (against Chrysler Capital and the Dealership)

124.     Mr. Garcia realleges and incorporates by reference the following paragraphs: 1, 6, 11–19, 22–23, 25–26, 40–51, 54–55, 58, and 60.

125.     Mr. Garcia brings this Claim in the alternative to Claim I and on behalf of himself.

126.     If the Court determines that New York's Motor Vehicle Retail Installment Sales Act ("MVRISA") governs Mr. Garcia's purchase/finance transaction, the Dealership and Chrysler Capital are liable for willfully violating the Truth in Lending Act ("TILA") disclosures incorporated into the MVRISA.

127.     Mr. Garcia's 2011 Dodge Durango qualifies as a "motor vehicle" under the MVRISA.  N.Y. PERS. PROP. LAW § 301(1).

128.     Mr. Garcia qualifies as a "retail buyer" under the MVRISA.  *Id.* § 301(2).

129.     The Dealership qualifies as a "retail seller" under the MVRISA.  *Id.* § 301(3).

130.     The Contract qualifies as a "retail instalment contract" under the MVRISA.  *Id.* § 301(5).

131.     Chrysler Capital qualifies as a "financing agency" under the MVRISA.  *Id.* § 301(9).

132.     Chrysler Capital is liable as a real party in interest to the Contract and, alternatively, as an assignee of the Contract.  *Id.* § 302(9).

133.     Under the MVRISA, the Contract must contain "[a]ll items required to be disclosed by the act of congress entitled 'Truth in Lending Act' [15 U.S.C. §§ 1601 *et seq.*] and

the regulations thereunder, as such act and regulations may from time to time be amended."

N.Y. Pers. Prop. Law § 302(5)(1).

134.    Willful violations of section 302 (the MVRISA section importing the TILA

requirements) bar "the recovery of any credit service charge, delinquency or collection charge or

refinancing charge on the retail instalment contract involved."  *Id.* § 307(2).

135.    In relevant part, TILA requires disclosure of the "amount financed," "itemization

of amount financed," "finance charge," "annual percentage rate," "payment schedule," "total of

payments," and "total sale price."  12 C.F.R. § 1026.18.

136.    "The disclosures shall reflect the terms of the legal obligation between the

parties."  *Id.* § 1026.17(c)(1).

137.    The disclosures must be accurate.  "If any information necessary for an accurate

disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best

information reasonably available at the time the disclosure is provided to the consumer, and shall

state clearly that the disclosure is an estimate."  *Id.* § 1026.17(c)(2)(i).  The Contract does not

state that any of the disclosures are estimates.

138.    The disclosed annual percentage rate ("APR") in a regular transaction—such as

Mr. Garcia's auto loan—must be accurate to within one-eighth (1/8) of one percentage point

(0.125%).  *Id.* § 1026.22(a)(2).

139.    Multiple TILA disclosures are inaccurate in the Contract because the sales tax

was incorrectly calculated.  At the time the Contract was formed, the applicable rate was

8.875%. Yet the rate applied was 9.90%.

140.     The applicable sales tax rate of 8.875% comprises the New York State tax (4.0%), the New York City tax (4.5%), and the Metropolitan Commuter Transportation District tax applicable in New York City (0.375%).

141.     The simplicity of calculating sales tax and the Dealership's knowledge of the applicable sales tax imply that the error was willful.  That few, if any, purchasers would double-check a dealership's sales tax calculation makes this error all the more reprehensible.

142.     The design of the Contract makes the sales tax error difficult to spot.  The cash price for the vehicle, excluding sales tax, is not provided.   Indeed, there is no place in the contract form to provide the cash price excluding sales tax.  The first item listed in the "Itemization of Amount Financed" is:

Cash Price (including $ 2578.74 sales tax)          $28635.00

The remainder of the "Itemization of Amount Financed" comprises various deductions (trade-in value, down payment, etc.) and additions for items such as insurance, taxes, service contracts, and fees.

143.     Deducting $2,578.74 from $28,635 results in a cash price for the vehicle of $26,056.26.  The sales tax charged, $2,578.74, amounts to 9.90% of the cash price of $26.056.26.  This is a tax overcharge of over 1.0%.  Upon information and belief, Defendants did not forward the overcharge to the New York State tax authorities, but rather pocketed it for themselves.

144.     Applying 8.875% to this cash vehicle price results in a cash price (including sales tax) of $28,368.76.  The correctly calculated cash price (including sales tax) is $266.24 less than the price charged to Mr. Garcia.  Therefore, within the "Itemization of Amount Financed" table, the "Cash Price," "Unpaid Balance of Cash Price," and "Amount Financed" are all incorrect—

$266.24 more than they should be.  Defendants therefore violated TILA, and hence the

MVRISA, by inaccurately disclosing the "itemization of amount financed."

      145.    Moreover, because of the sales tax overcharge, the TILA-required disclosures for

"Finance Charge," "Amount Financed," "Total of Payments," "Total Sale Price," and "Payment

Schedule" are inaccurate.

        a.    The disclosed "Finance Charge" is $22,636.75, which is $247.51 *more* than the correct charge of $22,389.24.

        b.    The disclosed "Amount Financed" is $24,500, which is $266.24 *more* than the correct amount of $24,233.76.

        c.    The disclosed "Total of Payments" is $47,136.75, which is $513.75 *more* than the correct total of $46,623.00.

        d.    The disclosed "Total Sale Price" is $54,636.75, which is $513.75 *more* than the correct total of $54,123.00.

        e.    The disclosed "Payment Schedule" is inaccurate because the disclosed monthly payment amount is $628.49, which is $6.85 more than the correct payment amount of $621.64.

      146.    Because of these violations of the MVRISA, Mr. Garcia is entitled to

(1) restitution of all finance charges, delinquency charges, and collection charges that he has paid

to date; (2) a declaration that Mr. Garcia is not obligated to pay any finance charge, delinquency

charge, or collection charge on the Contract; (3) an injunction ordering Defendants to modify

Mr. Garcia's account with Chrysler Capital such that the balance due and owing includes only

the accurate cash price of the vehicle; and (4) reasonable attorney's fees and costs.

## **REQUEST FOR RELIEF**

WHEREFORE Plaintiff prays for judgment as follows:

    A.    For an order certifying the proposed Class and appointing Plaintiff and his counsel to represent the Class;

B.  For an order awarding Plaintiff and the Class members actual, statutory, punitive, or any other form of damages provided by and pursuant to the common law and statutes cited above;

C.  For an order awarding Plaintiff and the Class members restitution, disgorgement, declaratory relief, injunctive relief, or other equitable relief provided by and pursuant to the common law and statutes cited above or as the Court deems proper;

D.  For an order awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

E.  For an order awarding Plaintiff and the Class members reasonable attorney's fees and costs of suit, including expert witness fees; and

F.  For an order awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: July 29, 2015
      New York, New York

                                                Respectfully submitted,

                                                */s/ Christopher B. Dalbey*

                                                Christopher B. Dalbey (CD1975)
                                                  cdalbey@weitzlux.com
                                              Robin L. Greenwald (*pro hac vice* admission pending)
                                                  rgreenwald@weitzlux.com
                                                **WEITZ & LUXENBERG, P.C.**
                                                700 Broadway
                                                New York, New York 10003
                                                Telephone:    (212) 558-5500
                                                Facsimile:    (212) 344-5461


                                                Karla Gilbride (KG7218)
                                                    kgilbride@publicjustice.net
                                                **PUBLIC JUSTICE, P.C.**
                                                1825 K St. NW, Ste. 200
                                                Washington, DC 20006
                                                Telephone:    (202) 797-8600
                                                Facsimile:    (202) 232-7203


                                                *Attorneys for Plaintiff and Proposed Class*