UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRANKLIN CABRERA GARCIA, individually and on behalf of all others similarly situated,

                Plaintiff,

- against -

CHRYSLER CAPITAL LLC and B&Z AUTO ENTERPRISES, L.L.C., d/b/a EASTCHESTER CHRYSLER JEEP DODGE,

                Defendants.

**OPINION AND ORDER**

15 Civ. 5949 (ER)

---

Ramos, D.J.:

    Franklin Cabrera Garcia ("Plaintiff") brings this action individually, and on behalf of all others similarly situated, against B&Z Auto Enterprises, L.L.C., d/b/a Eastchester Chrysler Jeep Dodge ("B&Z Auto") and Santander Consumer USA, Inc. d/b/a Chrysler Capital[1] ("Santander" or "Defendant"), asserting that Santander extended Plaintiff a loan in violation of New York usury laws. Additionally, Plaintiff brings several related state law claims against both B&Z Auto and Santander. Before the Court is Defendant's motion to dismiss the complaint. For the reasons set forth below, Defendant's motion is GRANTED without prejudice.

### I. BACKGROUND

#### A. Legal Background

    New York usury laws forbid lenders from charging "interest on the loan or forbearance of any money . . . at a rate exceeding [16% annually]." N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1). To constitute a loan there must be "(i) a contract, whereby (ii) one party

---

[1] Although Chrysler Capital LLC is named in the Complaint, Defendant points out and Plaintiff does not dispute that Santander is the correct entity Plaintiff intended to sue. *See* Defendant Santander Consumer USA, Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Def. Mem."), Doc. 31, at 1 n.1. Consequently, allegations in the complaint referring to Chrysler Capital LLC are construed to refer to Santander.

transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000) (citing *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914) (applying New York law)). "Where such is the intent of the parties, the transaction will be considered a loan regardless of its form." *Id.* If a contract is found to be in violation of the usury laws, "the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled." *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 740 (1992) (quoting N.Y. Gen. Oblig. Law § 5-511(2)).

For over a century, New York courts have held that a sale of personal property on credit is not subject to the state's usury laws. *Brooks v. Avery*, 4 N.Y. 225, 228 (1850); *see also, e.g.*, *Citipostal, Inc. v. Unistar Leasing*, 283 A.D.2d 916 (4th Dep't 2001). Known as the "time-price" doctrine, sellers of personal property are permitted to charge an increased credit price in exchange for receiving payments over time, rather than collecting the entire "cash price" up front. *Zachary v. R. H. Macy & Co.*, 31 N.Y.2d 443, 457 n.5 (1972). This price increase – known as the "time-price differential" or a "credit charge" – compensates the seller for the risk that the buyer will default and for the interest that the seller otherwise could have earned on an immediate cash payment. *Id.* Even though the "time-price differential" resembles interest on a loan, New York law does not treat it as such. *DeSimon v. Ogden Assocs.*, 88 A.D.2d 472, 479 (2d Dep't 1982) ("A seller's extension of credit by demanding a premium (a time-price differential) in the amount representing the difference between a cash and credit price is not considered to be a loan of money for usury purposes.").

In 1956, the New York legislature enacted the Motor Vehicle Retail Instalment Sales Act ("MVRISA") to regulate the sale of cars on credit. *See* N.Y. Pers. Prop. Law § 301. Credit sales

are usually executed by what is called a retail installment sale contract ("RISC"). The MVRISA sets forth detailed requirements governing the form and content of such contracts for the sale of cars. *Id.* § 302. For example, the MVRISA requires that the RISC be in writing and contain all of the agreements between the parties pertaining to the sale. *Id.* § 302(1). Moreover, the RISC must set forth all items required to be disclosed by the federal Truth in Lending Act, in addition to other disclosures such as potential rate increases and insurance charges. *Id.* §§ 302(5), 303(4), 302(2)(b).

Earlier iterations of the MVRISA restricted car dealers from assessing a credit charge above a certain rate. *See Bankers Commercial Corp. v. Murphy*, 28 Misc. 2d 609, 611 (N.Y. App. Term 1960). In 1980, however, the MVRISA was amended to allow car dealers to collect a credit charge at whatever rate the seller and buyer agreed upon. N.Y. L. 1980, c. 883, §§ 73, 74. Accordingly, New York Personal Property Law Section 303(1) (the "Credit Charge Provision") states: "A retail seller may contract for in a retail instalment contract and charge, receive and collect the credit service charge authorized by this article at the rate or rates agreed to by the retail seller and the buyer. NY. Pers. Prop. Law § 303(1).

The MVRISA also states that "a financing agency may purchase a retail instalment contract from a seller on such terms and conditions and for such price as may be mutually agreed upon." *Id.* § 302(10) (the "Assignment Provision"). A "financing agency" is defined as "a person engaged, in whole or in part, in the business of purchasing retail instalment contracts from one or more retail sellers." *Id.* § 301(9).

### B. Factual Background[2]

---

[2] The following factual background is based on allegations in the Amended Complaint, Doc. 28, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Plaintiff makes additional allegations, not mentioned herein, pertaining to his state law claims. Those allegations are omitted, because, for reasons described *infra* at 15, the Court declines to exercise supplemental jurisdiction over those claims.

On March 18, 2014, Plaintiff purchased a 2011 Dodge Durango ("Durango") from B&Z Auto Enterprises, L.L.C. ("B&Z Auto"), a car dealership located in New York.  Complaint ("Compl."), Doc. 1, ¶¶ 4, 13.  The purchase price for the Durango was approximately $26,000.  *Id.* ¶ 4.  Plaintiff paid $7,500 as a down payment.  *Id.* ¶¶ 11, 41.  B&Z Auto made an offer allowing Plaintiff to finance the balance over a 75-month period if he agreed to pay a credit charge equivalent to interest calculated at a 23.67% annual rate.  *Id.* ¶¶ 4, 50.

The transaction was consummated by a RISC entitled "Retail Installment Contract, Simple Finance Charge" (the "Contract").  *Id.* ¶ 42.  In the Contract, Plaintiff is named as the "Buyer" and "B&Z Auto dba Eastchester CJD" is named as the "Creditor – Seller."  *Id.* ¶ 47.  The Contract documented, *inter alia*, the annual percentage rate used to calculate the credit charge (23.67%), the total amount of the finance charge ($22,636.75), and the total sale price ($54,636.75).  *Id.* ¶ 49.  The Contract also included a provision that assigned the Contract to Defendant Santander, a financer of Chrysler and Dodge-brand automobiles, which was executed by the dealer.  *Id.* ¶¶ 22, 55.

Plaintiff made four monthly payments of $628.49 out of the 75 required under the Contract.  *Id.* ¶ 57.  On September 5, 2014, the Durango caught fire and was destroyed beyond repair.  *Id.* ¶ 58.  At that point, Plaintiff stopped making any payments owed under the Contract.  *Id.* ¶ 59.

Plaintiff now brings this action claiming that the Contract, though technically entered into with B&Z Auto, was in reality a *de facto* loan from Santander.  *See id.* ¶ 8.  Plaintiff claims that Santander "use[d] the form of the RISC as an artifice" to disguise its intention to extend a usurious loan.  *Id.* ¶ 31.  Although Santander does not give money directly to auto purchasers, Plaintiff alleges that it pays the vehicle's purchase price directly to a dealership upon being

4

assigned the purchaser's RISC.  *Id.* ¶ 26.  The purchaser subsequently makes periodic payments to Santander until the principal and interest are paid in full.  *Id.*  Plaintiff thus contends that the dealer merely acts as a "pass-through . . . stand[ing] in [Santander's] stead for purposes of the loan paperwork."  *Id.* ¶ 27.

Plaintiff alleges that a "loan" from Santander begins in one of two ways:  Either the customer obtains pre-approval from Santander, often through its website, or obtains approval at the dealership before the sale is consummated.  *Id.* ¶ 27.  When a transaction begins at the dealership, the dealer collects basic information about the applicant and uses an automated system to forward that information to Santander.  *Id.* ¶ 28.  Santander analyzes the applicant's "loan-worthiness" and responds with a "buy rate" – the lowest interest rate at which Santander will purchase the RISC.  *Id.*  New York law allows for dealers to mark up the buy rate, in which case Santander pays back the dealer the difference between the buy rate and the rate agreed to in the RISC.  *Id.*  Santander also informs the dealer of the maximum mark-up amount at which it will stand by its offer to purchase the RISC.  *Id.* ¶ 36.

After Santander provides the terms upon which it will purchase the RISC, the dealer applies those terms to the contract it enters into with the buyer.  *Id.* ¶ 31.  When the RISC is executed, it is immediately assigned to Santander, and the dealership is paid within a few days, if not the same day, by Santander.[3]  *Id.* ¶¶ 31, 33.  Plaintiff alleges that on the same day his Contract was executed, Santander opened a bank account in the name of Chrysler Capital for the purpose of collecting Plaintiff's payments.[4]  *See id.* ¶ 31.

---

[3] Plaintiff cites to Santander's website, which allegedly states that payment for a RISC is made within "24-48 hours after [it] is purchased."  Compl. ¶ 33.

[4] In the Complaint, Plaintiff only alleges:  "As shown by Mr. Garcia's credit report, Chrysler Capital opened Mr. Garcia's account on the day of the sale transaction."  Compl. ¶ 31.  Plaintiff specifies in his opposition brief, that Santander opened a bank account, in the name of Chrysler Capital, to deposit Plaintiff's payments for the Durango.

Plaintiff also alleges that Santander has impliedly referred to itself as a "lender" in internal communications with dealerships. *See id.* ¶¶ 36. Furthermore, Santander's website states that it provides "New Car Loans" and "Used Car Loans," and refers to its customers as "borrowers." *Id.* ¶¶ 35, 37.

Plaintiff argues that in sum, these allegations permit the inference that Santander indirectly extended a loan to Plaintiff, and that therefore the 26.37% credit charge was in violation of New York usury laws. *Id.* ¶¶ 75-107.

### C. Procedural Background

Plaintiff filed his Complaint on July 29, 2015. Doc. 1. Plaintiff brings three class-action claims against Santander, including for usury, deceptive acts or practices, and unjust enrichment in violation of New York law. Compl. ¶¶ 75-107. Plaintiff also brings three individual state law claims against Santander and B&Z Auto. *Id.* ¶¶ 108-146. Plaintiff claims that the Court has jurisdiction over the class action claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and that the Court may exercise supplemental jurisdiction over his individual state law claims. *Id.* ¶ 14-15. On December 11, 2015, Defendant Santander filed the instant motion to dismiss the Complaint. Doc. 30.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory

---

Plaintiff Franklyn Cabrera Garcia's Memorandum of Law in Opposition to Santander Consumer USA, Inc's [sic] Motion to Dismiss the Complaint (Dkt. 30) ("Pl. Opp."), Doc. 33, at 5.

statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III. DISCUSSION

#### A. Plaintiff's Usury Claims

Defendant argues that Santander cannot be held liable for usury, because the MVRISA authorizes dealers to charge whatever credit charge rate the parties agree to in the RISC, and to subsequently assign the RISC to third-party financing agencies like Santander. *See* Defendant Santander Consumer USA, Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Def. Mem."), Doc. 31, at 1. Plaintiff asserts that because the RISC in this case was immediately assigned to Santander upon execution, and because Santander participated in the transaction by, *inter alia*, setting the credit charge buy rate and maximum mark-up rate, Santander, as opposed to B&Z Auto, was the true party in interest to the credit sale. *See* Plaintiff Franklyn Cabrera Garcia's Memorandum of Law in Opposition to Santander Consumer USA, Inc's [sic] Motion to Dismiss the Complaint (Dkt. 30) ("Pl. Opp."), Doc. 33, at 6-11. Given that the MVRISA specifies that a "retail seller," as opposed to a "financer," may enter into a RISC and collect the credit charge, Plaintiff argues that the MVRISA does not shield Santander from liability under New York usury laws. *Id.*

In spite of Plaintiff's allegations, the Court finds that Santander's conduct did not disturb what was otherwise a clearly permissible credit sale pursuant to the MVRISA. The statute's Credit Charge Provision states that "[a] retail seller may contract for in a retail instalment contract and charge, receive and collect the credit service charge authorized by this article at the rate or rates agreed to by the retail seller and the buyer." N.Y. Pers. Prop. § 303(1). Here, there is no dispute that the Contract was entered into by Plaintiff and B&Z Auto, that both parties agreed to the 26.32% credit charge, and that the Contract resulted in the bona fide sale of a car. Upon execution of the Contract, the RISC was legally assigned to Santander in compliance with the statute's Assignment Provision. *Id.* § 302(10) ("[A] financing agency may purchase a retail instalment contract from a seller on such terms and conditions and for such price as may be mutually agreed upon.").

Plaintiff asserts that the MVRISA does not apply, however, because: (1) Santander preapproves customers before a contract is executed; (2) Santander sets the buy rate and the maximum amount that dealerships may mark up the buy rate; (4) Santander pays for the vehicle's purchase price to the dealership up front; (5) Santander's name (d/b/a "Chrysler Capital") already appears on the RISC before it is presented to the customer; (6) Santander opened an account in the name of Chrysler Capital the same day Garcia purchased the Durango; and (7) Santander formed Chrysler Capital for the primary consumer-oriented purpose of financing consumer purchases and leases at Chrysler-brand dealerships. Pl. Opp. at 4-5 (citing Compl. ¶¶ 21, 24, 30-31, 33, 35-36, 38).

Yet none of these actions contravene the MVRISA's Credit Charge Provision, nor are they barred by any other provision in the MVRISA. Although the alleged conduct permits the inference that Santander exerted influence over the credit charge rate ultimately provided by

8

B&Z Auto – such as by providing a buy rate and maximum markup on the buy rate – there are no allegations that anyone other than B&Z Auto and Plaintiff agreed to the credit charge rate, or that B&Z Auto was under any obligation to align the credit charge rate with the terms provided by Santander.[5] The fact that Santander informed B&Z Auto of the terms upon which it would purchase the Contract does not suggest that the credit charge rate was not "agreed to by the retail seller and the buyer." Indeed nothing in the MVRISA prohibits retail sellers and financers from coordinating the terms upon which a RISC will be assigned. Rather, the Assignment Provision allows a seller and financer to freely negotiate the terms and conditions of an assignment.[6] And references to financers in several other of the statute's provisions indicate that the Legislature clearly contemplated the involvement of financers in vehicle credit sales.[7] One such provision in fact acknowledges that a RISC could be assigned to a financer within thirty days of being executed. *See* N.Y. Pers. Prop. Law § 302(6).[8]

---

[5] In fact, Plaintiff himself suggests that "dealerships search for the best deal for themselves—the highest 'reserve'" amongst different financers. *See* Compl. ¶ 28.

[6] The full text of the Assignment Provision makes this particularly apparent:

> Notwithstanding any contrary provision of the personal property law, lien law, banking law or other law: (a) a financing agency may purchase a retail instalment contract from a seller on such terms and conditions and for such price as may be mutually agreed upon; and (b) no filing of the assignment, no notice to the buyer of the assignment, and no requirement that the seller be deprived of dominion over payments upon the contract or over the vehicle if repossessed by or returned to the seller, shall be necessary to the validity of a written assignment of a retail instalment contract as against creditors, subsequent purchasers, pledgees, mortgagees or encumbrancers of the seller.

N.Y. Pers. Prop. Law § 302

[7] *See* N.Y. Pers. Prop. Law § 301(9) (defining "financing agency"); § 301(10) (defining the "holder" of a RISC that has been purchased as a "financing agency" or other assignee); § 302(6) (setting out insurance requirements for "the seller or financing agency").

[8] According to N.Y. Pers. Prop. Law § 302(6): "The seller or financing agency, if insurance on the motor vehicle is included in a retail instalment contract, shall within thirty days after execution of the retail instalment contract send or cause to be sent to the buyer a policy or policies or certificate of insurance, written by an insurance company authorized to do business in this state, clearly setting forth the amount of the premium, the kind or kinds of

9

Plaintiff attempts to distinguish these provisions by arguing that all of the MVRISA's references to financers contemplate actions occurring *after* a RISC exists and, in most cases, after it has been executed by the retail seller and buyer. Pl. Opp. at 6. Plaintiff argues therefore that the MVRISA does not condone Santander's conduct, which for the most part, occurred prior to the Contract's execution. Yet the MVRISA's silence also indicates that there is no statutory basis for Plaintiff's claim that the alleged conduct was improper.

Plaintiff, perhaps recognizing this, claims that courts interpreting earlier versions of the MVRISA and other retail instalment statutes have taken "a close look at the conduct of purported assignees and their connections to the seller and the supposedly bilateral sales transaction," and that this has "led those courts to invalidate provisions in contracts attempting to waive the buyer's right to assert claims against an assignee of the contract." Pl. Opp. 9. Neither of the two cases Plaintiff cites, however, suggest that an assignee's connection to a seller transmutes a legitimate credit sale into a loan. In *Nassau Discount Corp. v. Allen*, 255 N.Y.S.2d 608, 614 (N.Y. Civ. Ct. 1965), the Court found that an assignee could not escape fraud claims attributed to the assignor of the contract, given the parties' close dealings with one another. In *Public Nat'l Bank v. Fernandez*, 121 N.Y.S.2d 721, 724 (N.Y. Mun. Ct. 1952) the Court found that waiver provisions designated to an assignee did not necessarily apply, given the assignee's intimate involvement in the underlying transaction. Thus in neither case did the Court find that the relationship between the seller and assignee altered the fundamental character of the underlying transaction.

---

insurance and the scope of the coverage and all the terms, exceptions, limitations, restrictions and conditions of the contract or contracts of insurance."

The only case Plaintiff cites that could possibly be found to support his claim is *Ford Motor Credit Co. LLC v. Black*, 27 Misc. 3d 1211(A) (N.Y. Civ. Ct. April 14, 2010), an unreported New York City Civil Court opinion.  In *Black*, the court acknowledged that the MVRISA does not limit the credit charges rate agreed to by a seller and purchaser.  *Id.* at *4.  It nonetheless concluded that a 24% credit charge rate was usurious, and that the transaction was a "'sham' financial arrangement designed to avoid New York's usury laws." *Id.* at *6.  Thus, the court simply appears to have ignored the statute's Credit Charge Provision, finding that "when the statute permits the parties to 'agree' on a rate[,] the legislature intended that 'agreement' to be . . . within the state usury law so as not to make it 'illegal' and unenforceable." *Id.* at *6-7.  That simply is not the law, nor is it what Plaintiffs are advocating for here.  Consequently, the Court does not find *Black* to be persuasive authority.

In addition to citing these cases, Plaintiff appeals to the legislative intent behind the MVRISA.  Plaintiff asserts that the "temporal distinctions about when Santander became involved in the transaction are not matters of formal semantics but go to the heart of the Legislature's purposes in enacting the MVRISA." Pl. Opp. at 7.  He argues that the legislative history and commentary surrounding the enactment of the MVRISA in 1956 indicates the "purposeful inclusion of 'retail sellers' but not financers or lenders as original parties to retail installment contracts." *Id.* at 8.  According to Plaintiff, the Legislature sought to allow sellers "greater leeway to obtain compensation for selling on instalment," because the Legislature "seemingly viewed [sellers] as facing different risks in the marketplace than financers—namely the risk of non-payment—possibly because their primary business is the sale of goods and not the extension of credit or loans." *Id.* at 8-9.  Plaintiff claims, therefore, that Santander "should not be allowed to engage in risk arbitrage by facing the actual risks of a 'financing agency' while

11

enjoying the added compensation the Legislature determined is due only to 'retail sellers' facing heightened risks." *Id.* at 9.

Yet the speculative nature of Plaintiff's theory is betrayed by his own language. The claim that the Legislature "*seemingly* viewed [sellers] as facing different risks . . . *possibly* because their primary business is the sale of goods," is not supported by any evidence. Indeed, the references Plaintiff cites to suggest nothing more than the common-sense fact that retail sellers, not financers, sell merchandise.[9] Therefore, it is unsurprising that the Legislature used the term "retail sellers" as opposed to "financers" in a provision governing the sale of cars.

Furthermore, it is quite clear that the Legislature's actual purpose in enacting the MVRISA was not to protect retail sellers, but to protect consumers in the wake of increasingly abusive credit sale practices *by retail sellers*. Indeed, in its earlier forms, the MVRISA actually did restrict credit charge rates, thus overriding the common law time-sale doctrine that had previously allowed sellers to charge any rate they pleased. *See Bankers*, 28 Misc. 2d at 611. And in its present form, the bulk of the MVRISA's provisions are aimed at ensuring that credit sale contracts clearly reflect the terms of a given transaction. *See* N.Y. Pers. Prop. Law § 302(1)-

---

[9] Plaintiff cites a statement by the New York Governor at the time, in which he says: "[F]inance and service charges in the field of installment sales[,] … [c]harges of various types added to the original cash price often result in a total which is far out of line with the risk assumed and the services rendered by the *seller*." State of N.Y., Public Papers of Averell Harriman, Fifty-Second Governor of the State of N.Y., at 23–24 (1956) (emphasis added). Plaintiff also cites to a statement by the Counsel to the N.Y. State Council of Retail Merchants, made "during a hearing of the legislative committee whose work ultimately led to the passing of the MVRISA," which reads: "The retailer is neither a financier nor a banker. His common role is to provide the needful things of life to the people of his trading area[.]" Minutes of Public Hearing, Albany, N.Y., Special Joint Legislative Committee on Installment Sales, Feb. 15, 1949. As a preliminary matter, it is not clear how informative either of these statements are of the Legislature's intent in passing the MVRISA – Governor Harriman's statement, though made the same year that the statute was enacted, is devoid of context, and the statement by the Counsel to the Council of Retail Merchants was made seven years prior to the MVRISA's enactment. In any case, neither statement suggests anything more than that there was a growing concern by the government about credit sale abuse, and a growing concern amongst retail sellers of government regulation. Neither suggests anything about the involvement of financers in credit sales. Nor do any of the other references in Plaintiff's opposition – which Plaintiff cites to in similar fashion by stressing the speaker's use of the term "seller" – suggest that credit sale regulation was in any way prompted by a concern for sellers vis-à-vis financers. *See Bankers*, 28 Misc. 2d at 612.

(10). That the purpose of the statute was to protect consumers from abusive credit sale practices is also substantiated by a plethora of contemporaneous academic authority.[10]

Commentary on the MVRISA and credit sales in general further indicates that well before the MVRISA's enactment, financers were intimately involved in credit sale transactions.[11] One commentator observed in 1951, five years prior to the MVRISA's enactment, that: "As a group [finance companies] serve an important economic function. By purchasing from dealers installment contracts arising from sales of automobiles and other durable goods, the sales finance group extends credit indirectly to consumers through retailers." Note, *Protection of Borrowers in Distribution Finance*, 60 Yale L.J. 1218, 1919 n.5 (internal quotation marks omitted). Another commentator observed in 1952 that "[s]ales finance companies exert powerful influences over installment sellers. In fact, 'after World War I the initiative in determining the terms and conditions of retail instalment financing transactions largely passed from the instalment seller to the finance company.'" Note, *Protection of*

---

[10] *See, e.g.*, William D. Warren, *Regulation of Finance Charges in Retail Instalment Sales*, 68 Yale L.J. 839, 851, 854 (1959) ("As of January 1959, twenty-three of the thirty-one states having retail instalment sales legislation imposed limitations on finance charges. . . . The principal function of these statutes appears simply to be the protection of credit consumers against excessive gouging by those dealers and financers who, taking advantage of the public's notorious indifference to finance rates, exact exorbitant charges."); Note, *Retail Instalment Sales Legislation*, 58 Colum. L. Rev. 854, 862 (1958) ("[S]tate legislation in [the area of credit sales] has been conceived of as ameliorative or remedial, in the sense of bringing greater equality of bargaining power to the sales transaction and protecting unwary consumers from possible 'abusive' practices of the vendors and financers.").

[11] *See* Note, *Protection of Borrowers in Distribution Finance*, 60 Yale L.J. 1218, 1221-23 (1951) ("Financing consumers' installment buying, long beyond the reach of usury statutes, is the finance companies' bonanza. They vie for this lucrative trade with special inducements to retailers. A "kickback" often gives the retailer a slice of their profits from installment sales finance."); Warren, *supra*, at 857 ("To the General Motors Acceptance Corporation (GMAC) is attributed the origination, *in 1925*, of dealer participation, the practice by which finance companies rebate to retailers a portion of the finance charges paid by consumers.") (emphasis added); *id.* at 859 ("As already suggested, because of the practice of dealer participation, increased competition among sales-finance companies tends to exact not lower finance rates from the instalment purchaser but higher ones. The finance company that establishes a working arrangement with a dealer can confidently anticipate that the dealer will sell to it most of his retail instalment contracts. And since dealers can, within limits, induce most buyers to finance on the terms offered by the dealer-chosen financer, sales-finance companies . . . compete directly for the dealer's business rather than for the consumer's."); *Retail Instalment Sales Legislation*, *supra*, 859-60 ("[T]he fictional quality of the time sales doctrine has become even more transparent in an age when instalment credit sales are typically tripartite transactions between buyer, seller, and finance company, with the buyer in actuality paying for the use of money just as he would had he secured a direct loan from the finance company.")

*Automobile Installment Buyers: The FTC Steps In*, 61 Yale L.J. 718, 719 n.8 (1952) (quoting Wallace P. Mors, *State Regulation of Retail Instalment Financing--Progress and Problems,* 23 J. of Bus. U. of Chi. 199, 201 (1950)).

Yet in deciding how to regulate this activity, the New York Legislature has not chosen to restrict the relationship between financers and retail sellers.  Nor has the Legislature enacted such restrictions in amending the statute.  Thus regardless of whether the MVRISA is sound policy, the Court is not entitled to read into the statute restrictions that do not exist.  This principle applies with particular force here, as the Legislature appears to have contemplated how to regulate vehicle credit sales, and yet did not enact the restrictions sought by Plaintiff.

The Court thus finds that in spite of Santander and B&Z Auto's alleged conduct, Plaintiff entered into a legitimate credit transaction pursuant to the MVRISA.  Consequently the 26.32% credit charge that Plaintiff agreed to is not subject to New York usury laws.

### B.  Plaintiff's Additional State Law Claims

Under 28 U.S.C. § 1367, a district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction."  In the present case, the only asserted basis for this Court's original jurisdiction is the Class Action Fairness Act, 28 U.S.C. § 1332(d).  However, all of Plaintiff's class-action claims, which are founded upon his allegations of usury, must be dismissed.  This leaves only Plaintiff's individual state-law claims, which the Court declines to exercise supplemental jurisdiction over.

### IV. CONCLUSION

For the reasons stated above, Defendant Santander's motion to dismiss is GRANTED.  Because it is not clear that granting Plaintiff leave to amend his Complaint would be futile, the

Complaint is dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 30, and close the case.

It is SO ORDERED.

Dated:   September 30, 2016
         New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.